U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
SEP 17 2021
CLERK, U.S. DISTRICT COURT
By_____
Deputy

1
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA,

    Plaintiff.

    -vs-

MICHAEL BLAINE FAULKNER,

    Defendant.

Docket No. 3:09-cr-00249-D-2

## SUPPLEMENT TO THE MOTION FOR COMPASSIONATE RELEASE BROUGHT PURSUANT TO 18 U.S.C. §3582

COMES NOW the Defendant herein, MICHAEL FAULKNER, by and through the undersigned counsel, and presents this Supplement and moves this Honorable Court to order to grant his Motion for Compassionate Release pursuant to 18 U.S.C. §3582(c) due to the substantial risk to himself and the community from the current COVID-19 pandemic. In support of the motion, Mr. Faulkner states the following.

Mr. Faulkner filed a motion for a reduced sentence pursuant to 18 U.S.C. §3582(c)(1)(A)(I) in this Court on July 29, 2020. The motion was denied on August 13, 2020, as the Court found that Mr. Faulkner failed to present "extraordinary and compelling reasons" for a sentence reduction. Doc. 1910 at PageID #20439. The Court relied upon language contained in U.S.S.G. §1B1.13 regarding the mandatory application of the "extraordinary and compelling" reasons rubric to the motion. Doc. 1910 at PageID #20439.

Mr. Faulkner appealed the denial of the motion. On August 3, 2021, the United States Court of Appeals for the Fifth Circuit vacated the order of denial, finding that this Court erred in

2

applying U.S.S.G. §1B1.13 as "binding and dispositive" in considering a motion under 18 U.S.C. §2582(c)(1)(A). Doc. 1917 at PageID #20761. The matter was remanded, with Mr. Faulkner being given an opportunity to file a supplement to the motion for reduced sentence. Doc. 1919 at PageID #20764.

Under U.S.S.G. §1B1.13, sentences can be reduced should "extraordinary and compelling" reasons be presented. Mr. Faulkner submits that the decision of the appellate court lifts the mandate of such a strict and difficult showing. However, the situation presented by COVID-19 has been found to meet the extraordinary and compelling threshold. In United States v. Sawicz, 453 F. Supp. 3d 601 (E.D.N.Y. Apr. 10, 2020), the court found that "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension, justifies waiver here [of the exhaustion/waiting period].... I agree with the defendant that the risk of serious illness or death that he faces in prison constitutes an extraordinary and compelling reason militating in favor of his release." In United States v. Almontes, 2020 U.S. Dist. LEXIS 62524 (D. Conn. Apr. 9, 2020), the court found as follows:

> [A] combination of factors convinces me that there are extraordinary and compelling reasons to reduce Almonte's sentence. Almonte's medical condition may alone amount to an extraordinary and compelling reason to do so because his cervical myelopathy is a serious physical condition that will soon leave Almonte unable to care for himself in prison. If Almonte does not get the surgery he needs, he will not recover from his condition. If he remains in BOP's custody, Almonte will not get the surgery quickly enough. The surgery has already slipped through the cracks for a year and a half, and there is little chance for any improvement, given the rise of COVID-19 and concomitant logistical complications. Further, Almonte's rehabilitation from his former life of crime has been total, and he has a supportive network of family ready to help him reintegrate into society. Finally, because of changes in the law that did not affect him, Almonte's more culpable co-conspirators have been afforded leniency while Almonte has not.

3

Id. Similarly, in Miller v. United States, 453 F. Supp. 3d 1062 (E.D. Mich. Apr. 9, 2020), the court waived the exhaustion/waiting period under §3582(c)(1) as defendants with underlying medical conditions who have a higher risk of falling severely ill from COVID-19 should be granted compassionate release in order to avoid a "lethal decision." See also United States v. Gentille, 2020 U.S. Dist. LEXIS 62680 (S.D.N.Y. Apr. 9, 2020).

Mr. Faulkner submits that the current health crisis occurring throughout the BOP due to COVID-19 justifies his release in this matter, even absent extraordinary and compelling reasons. Only 51% of BOP guards and staff have taken the vaccine again exposing inmates to the virus on a daily basis. See Exhibit A. Units A, B, C, D, E, F, G and K within FCI Texarkana, where Mr. Faulkner is incarcerated, are located in separate gated areas of the facility. Inmates in each unit are quarantined from each other. However, guards from each of these units regularly walk through other units, including during count where two guards are required, and often without masks or protective gear, thus defeating the quarantine effort.

Moreover, up to four inmates live in cells that are less than 100 square feet. This violates the BOP Mandatory space requirements of 60 square feet per inmate for each cell. This was recently addressed by the Senate Judiciary Committee during hearings on April 15, 2021. Exhibit B - BOP Policy Statement on square footage. Placing four inmates in a room 9-ft x 10-ft (90 square feet), bunks included, violates the 6 feet social distance requirement and the 120 square foot design specification. This policy violation is causing the infection to spread like wildfire throughout the facility and others in the United States. All "low" and "camp" facilities are supposed to comply with the space requirements, but none do. These facilities are over utilized by the BOP to house more inmates at their expense during this pandemic.

4

In addition, hallways are only four feet wide. Inmates regularly have to pass within one foot of one another to move within the unit. This violates the six-foot CDC requirement. The toilets, urinals and sinks are immediately next to one another in one room. It is the same for telephones and computers. Inmates must stand in lines right next to each other to receive food, laundry, commissary, and to get in and out of their housing units. Under perfect conditions the restroom facilities are only cleaned once a day. It is impossible to social distance in these conditions. Hand soap dispensers are often empty and many inmates cannot afford hand soap so again, these unsanitary conditions are present throughout the facility.

There are inmates from all units that work in construction management services, food services, education and laundry which exposes inmates from different units to each other. Laundry services are only offered one time a week so inmates are regularly using unsanitary towels and clothing. These conditions cause the unfettered spread of the virus. Inmates are only provided with five days of clothing. Laundry service is provided only once every seven days. Inmates are forced to wear soiled laundry two days a week under current BOP policy. This unsanitary condition further exacerbates the spread of disease and COVID-19. Last year during the COVID pandemic, there was an outbreak of scabies, a serious parasitic skin infection by mites which causes open wounds and scars similar to chicken pox. The outbreak occurred throughout the entire facility requiring all inmates to undergo chemical treatments to kill the bugs. This is only contracted by human to human contact, further establishing the complete inability to perform even the slightest social distancing. It is impossible to "self-care" at FCI Texarkana. The conditions outlined in the accompanying brief describe the living environment and the inability to "social distance." Most disturbing is the fact that this facility does not have

5

air filtration systems despite CDC recommendations. The BOP has done nothing to install them at FCI Texarkana.

All of these conditions in the prison environment have resulted in multiple class action lawsuits against the BOP. The BOP has done a terrible job of managing the COVID-19 pandemic. "As it is widely noted, prisons are not designed for social distancing. In fact, they are designed just for the opposite." Testimony of Michael Carvajal, June 2, 2020, Committee on the Judiciary, U.S. Senate. See Occupational Health agency where staff from over 100 institutions (including Texarkana FCI) filed imminent danger reports. See Executive Order 12196, 29 CFR 1960.8.

Further, the heightened risk to Mr. Faulkner due to the coronavirus pandemic justifies his request for compassionate release. Mr. Faulkner submits that he is at risk of contracting COVID-19, also known as coronavirus, should he remain incarcerated in this matter, which could result in a debilitating illness. Complications from coronavirus include pneumonia in both lungs, organ failure in several organs, and death.[1] As this Court is no doubt aware, coronavirus has been labeled a pandemic by the World Health Organization.[2] The pandemic has become increasingly dangerous, given the presence of variant strains that are more easily transmitted, can cause more serious illness, and are ate least somewhat more vaccine resistant.[3] Mr. Faulkner submits that the health risk to himself and the community is incredibly heightened in this pandemic given the conditions in the federal jails, where it is impossible to practice safe social distancing and proper

---

[1] https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963.

[2] https://www.theguardian.com/world/2020/mar/11/who-declares-coronavirus-pandemic

[3] https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html

6

hygiene. Further, as this Court is aware from the original pleading, Mr. Faulkner suffers from serious medical conditions that could give rise to a greater chance of serious consequences from a COVID-19 infection, including obesity (BMI 31.5), hypertension, hypothyroidism, and allergic asthma. Doc. 1910 at PageID #10439-20440. As a result, Mr. Faulkner submits that he is at higher risk of suffering severe illness should he contract the coronavirus.[4] This state of affairs necessitates compassionate release.

Moreover, state courts are releasing non-violent criminal inmates, and the federal government has followed suit.[5] As of September 1, 2021, there have been more than 43,000 federal inmates who have confirmed positive test results for COVID-19 nationwide, along with 248 inmate deaths.[6] The former Attorney General has issued a memo to the Director of the Bureau of Prison to release those inmates at increased risk from contracting the coronavirus and suffering from underlying health issues that could endanger the defendant.[7] Accordingly, in order to be protected from this health menace, Mr. Faulkner requests that he be granted compassionate release.

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fpeople-at-higher-risk.html

[5] https://www.wdrb.com/news/crime-reports/us-starts-to-release-inmates-due-to-coronavirus-outbreak/article_114cb9ac-6ab3-11ea-a928-f3cffe6f1fec.html; https://www.yahoo.com/lifestyle/jail-inmates-fearful-virus-argue-043711286.html; https://www.politico.com/news/2020/04/11/federal-prison-release-criteria-coronavirus-179835

[6] https://www.bop.gov/coronavirus/

[7] https://www.scribd.com/document/453777104/COVID-19-BOP-Memo-Re-Home-Confinement-2020-03-26

7

Mr. Faulkner submits that, should he not be granted compassionate release, that he qualifies for relief under the CARES Act. Prior to the COVID-19 pandemic, the BOP had discretion to release inmates who had served at least 90% of their sentence to home confinement to assist the inmate with post-incarceration community reentry. 18 U.S.C. §3624(c)(1)-(2). "Home confinement" does not mean the person returns to normal life; rather, it means that the person is subject to strict monitoring and restrictions by the Court and Probation Office for the remainder of their custodial sentence. The home confinement statute not only authorizes, but in fact urges, BOP to "place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph." 18 U.S.C. §3624(c)(2). Under normal circumstances, the "maximum amount of time permitted" is 10% of the inmate's sentence or six months, whichever is shorter. Id.

On March 27, 2020, former President Trump signed the CARES Act into law in response to the COVID-19 pandemic, expanding the scope of the home confinement statute. The CARES Act authorized the Attorney General to remove the time limits on home confinement under 18 U.S.C. §3624(c)(1)-(2). The Act permits the BOP to release inmates to home confinement even if they have not served 90% of their sentence, or if they have more than six months left to serve. Specifically, the CARES Act provides:

> During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the amount of time for which the Director is authorized to place a prisoner in home confinement . . ., as the Director deems appropriate.

See H.R. 748 §6002 at Div. B, Tit. II, Sec. 12003(b)(2).

8

On April 3, 2020, former Attorney General Barr issued a memorandum in which he made the requisite finding that emergency conditions will materially affect the functioning of the BOP. Attorney General Barr directed the BOP to release inmates from institutions that are already overcome by COVID-19, naming three facilities in particular and extending the order to "similarly situated facilities where you determine that COVID-19 is materially affecting operations."[8] FCI Texarkana, where Mr. Faulkner is incarcerated, has as recently as July 27, 2021 had 126 confirmed COVID-19 cases amongst the inmates.[9] FCI Texarkana is currently operating at a "Level 3" Modified Operation Level, which is the most stringent level of operating, indicating that "intense" modifications to operating procedures have been made to deal with the COVID-19 crisis.[10]

Under the CARES Act and the Attorney General's directive, because FCI Texarkana's operations have been materially affected by COVID-19, the BOP now has the authority to transfer Mr. Faulkner to home confinement to serve the remainder of his sentence, followed by supervised release.

Under 18 U.S.C. §3624(c) and §3621(b)(4), this Court has the authority to recommend where a defendant should be incarcerated. This includes determining whether a defendant should be confined in a halfway house or home confinement.

---

[8] Attorney General Barr, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (April 3, 2020), https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000.

[9] https://www.ksla.com/2021/07/20/covid-19-rises-texarkana-federal-prison/

[10] https://www.bop.gov/coronavirus/

9

  Mr. Faulkner submits that he has taken the steps necessary to justify release herein. Since his incarceration on January 15, 2010, Mr. Faulkner participated in virtually all programs offered by the Bureau of Prisons. Mr. Faulkner has participated in all First Step Act "programming" which will eventually result in a 50% reduction of his remaining sentence to home confinement (The FSA has not yet been fully implemented by the BOP). Mr. Faulkner have not received any administrative complaints from the Bureau of Prisons and has an impeccable record as an inmate.

  Mr. Faulkner has been evaluated by the Bureau of Prisons with a PATTERN Evaluation. This assessment is a tool utilized by the BOP to determine the likelihood of violence and recidivism. This is based upon their experience with the inmate, his criminal history and statistics that the BOP utilizes in releasing inmates. The BOP determined that Mr. Faulkner was a "low risk" for recidivism, and that he had a "minimum" custody score, which qualifies an inmate for "Out Custody" in the BOP.

  Refusing to release Mr. Faulkner and leaving him a situation that appears hopeless is unlikely to result in Mr. Faulkner being rehabilitated. Hope must remain the cornerstone of any rehabilitative effort.

> Hope is the necessary condition of mankind for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than necessary to satisfy the goals of punishment.

United States v. Carvajal, 2005 U.S. Dist. LEXIS 3076 (S.D.N.Y. 2005).

10

**WHEREFORE**, in consideration of the foregoing, Mr. Faulkner respectfully prays that this Court issue an Order granting compassionate release.

Respectfully submitted,

_____  9/8/2021
Michael B. Faulkner, declarant

# Exhibit "A"

OPI:    IPA/ORE

NUMBER:   **1060.11**, CN-1

DATE:   October 30, 2017

# Rated Capacities for Bureau Facilities

*Approved*: Mark S. Inch

Director, Federal Bureau of Prisons

**SUBJECT**: Rated Capacities for Bureau Facilities

1. <u>PURPOSE AND SCOPE.</u>   To establish procedures for determining and reporting each institution's rated capacity and its total capacity.

Determination of available housing for inmates is an essential management information requirement.  Bureau capacity planning requires accurate and timely reporting of current institutions' rated capacities.

This information's reliability is critical to:

• Bureau budget justifications for capital resources and the budget analyses performed by the Department of Justice Budget Staff, Office of Management and Budget, and the Congress.

• Rated capacity is the baseline for the statistical measurement of prison crowding and is essential to managing the Bureau's inmate population to distribute the inmate population throughout the system reasonably and equitably.

2. <u>PROGRAM OBJECTIVES.</u> The expected results of this program are:

a.     The Bureau's inmate population will be managed and distributed on an equitable and rational basis in accord with capacity computation formulas, security considerations, and institution needs.

proj

1

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

b. Facility design and development plans will ensure sufficient design capacity is available at each security level.

c. Bureau capacity planning will be based on timely and accurate information received from all appropriate sources, including institutions.

5. DEFINITIONS

a. <u>Rated Capacity</u> means an institution's total capacity less hospital/infirmary, administrative detention, and disciplinary segregation. (The medical bedspace at the medical referral centers is to be included in the rated capacity for these institutions). Rated capacity is not necessarily the same as any institution's design or operating capacity. It is the objective measurement of inmate housing space without regard to items such as institution age, location, or infrastructure.

b. <u>Total Capacity</u> means an institution's rated capacity plus the capacity of housing used for medical and special housing purposes. This includes administrative detention and disciplinary segregation.

c. <u>Single Occupancy</u> means a room, cell, or cubicle less than 120 square feet which is to be occupied by one inmate.

d. <u>Double Occupancy</u> means a room, cell, or cubicle less than 120 square feet which is to be occupied by two inmates.

e. <u>Cubicle Housing</u> means the partitioning of a housing area into spaces of less than 120 square feet. This has most often been done by the use of concrete block, but other materials may be used. Cubicle heights vary, but are usually less than six feet.

f. <u>Multiple Occupancy Housing</u> means a room, cell, or area of 120 square feet or more that is not partitioned. The most common form of this kind of housing is an "open dormitory".

g. <u>Permanent housing</u> means any designed inmate housing areas or any offices, buildings, or units which the Regional Director

proj

2

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

has approved for conversion to **permanent** inmate housing.

h.   <u>Temporary housing</u> means the **temporary** use of tv rooms, hallways, mezzanines, gyms etc. as inmate housing to accommodate population increases.

(3)   <u>Low Security</u>

   (a)   <u>Rooms, Cells and Cubicles.</u>   If less than 65 square feet, space shall be rated for single occupancy only; if 65 square feet or more, but less than 120 square feet, 100 percent of rooms, cells, and cubicles shall be rated for double occupancy.

   (b)   <u>Multiple Occupancy Housing Areas.</u>   If 120 square feet or more, rated capacity is computed by dividing the total space

of each sleeping area or unit by 60 square feet.

pro<sub>|</sub>

3

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## **CERTIFICATE OF SERVICE**

I, Michael B. Faulkner hereby declare under the penalty of perjury that I am a party to this action and have deposited in the mail system of the Texarkana Federal Correctional Institution the Motion of Supplemental Declaration in support of Original Motion for Compassionate Release, with the appropriate first class postage for the parcel addressed to the following:

CLERK OF THE COURT
United States District Court
Northern District of Texas
1100 Commerce Street Room 1452
Dallas, Texas 75242-1495

Signed on this the 25th day of August, 2021 in Texarkana, Texas.

*[signature]*
**Michael B. Faulkner, Declarant**

